DA 08-0236

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 282

IN RE THE MARRIAGE OF
JENNY L. WILLIAMS,

      Petitioner, Appellant and Cross-Appellee,

  and

BOBBY L. WILLIAMS,

      Respondent, Appellee and Cross-Appellant.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
                       In and For the County of Yellowstone, Cause No. DR 04-1205
                       Honorable G. Todd Baugh, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

            Mark D. Parker, Parker, Heitz & Cosgrove, Billings, Montana

        For Appellee:

            Stephen C. Mackey, Towe, Ball, Enright, Mackey & Sommerfeld, Billings, Montana


                          Submitted on Briefs: May 20, 2009

                                 Decided: August 25, 2009


Filed:

          _____
                         Clerk
Justice Brian Morris delivered the Opinion of the Court.

¶1     Jenny L. Williams (Jenny) appeals from a decree entered in the Thirteenth Judicial District, Yellowstone County, that dissolved her marriage to Bobby L. Williams (Bobby), distributed their marital estate, and awarded child support.  Bobby cross-appeals.

¶2     We review the following issues on appeal:

¶3     *Did the District Court incorrectly include Bobby's interest in B&J Properties in the marital estate?*

¶4     *Did the District Court improperly reduce Bobby's income for the calculation of child support based on the fact that Bobby derived a portion of his income from B&J Properties?*

¶5     *Did the District Court improperly discount by 35% the value of Bobby's interest in B&J for the purposes of the distribution of marital property in order to reflect Bobby's lack of control in B&J Properties?*

¶6     *Did the District Court's property apportionment incorrectly double count against Jenny the retirement fund that she cashed out after the separation?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶7     Jenny and Bobby married in June of 1994.  Jenny was 20 and Bobby was 35 at the time of the marriage.  The parties have three minor children born in 1993, 1995, and 1998. Jenny filed a petition for dissolution of marriage on September 17, 2004.

¶8     Jenny and Bobby have high school educations.  During the marriage, Jenny stayed at home and served as the primary caregiver for the three children.  Bobby worked long hours outside the home in the family trucking business.

2

¶9 J.E. Williams, Bobby's father, began his own trucking business under the name of J.E. Williams Trucking, Inc. in 1969. Bobby began working in the business at a young age. Bobby started working as a full-time employee of J.E. Williams Trucking, Inc. when he graduated from high school in 1977. J.E. Williams began giving Bobby stock in J.E. Williams Trucking, Inc. in 1982. Bobby became the sole shareholder of J.E. Williams Trucking, Inc. in 2000, after the company redeemed all of J.E. Williams's stock.

¶10 Bobby and his father also each owned one-half interests in WHW, Inc., and J.E. Williams, Inc. WHW, Inc. is a trucking company that hauls a different type of cargo that requires specialized trucks. J.E. Williams, Inc. handles the payroll for shop mechanics, owns only a few trucks, and has no customers other than J.E. Williams Trucking, Inc.

¶11 J.E. Williams Trucking, Inc. and WHW, Inc. formed and were capitalized before the marriage. J.E. Williams, Inc. split off from J.E. Williams Trucking, Inc. after Jenny and Bobby had married. Bobby's interest in the entities derives from the interest in J.E. Williams Trucking, Inc. that his father originally gifted to him. Bobby manages all three entities. All three entities operate out of the same location.

¶12 Bobby also received income from B&J Properties, LLC (B&J). The income that Bobby received from B&J boosted his yearly taxable income to at least $200,000 to $300,000. B&J is a closely held corporation owned 50% by Bobby and 50% by his father. Bobby and his father formed B&J, a real estate holding company, in 1995. B&J owned five commercial real estate properties around the country and two commercial airplane hangers in Billings.

3

¶13 The District Court included B&J in the marital estate. The court reduced Bobby's income for child support calculation purposes, however, to reflect the fact that B&J was a sub-chapter S corporation and Bobby, as a 50% owner, could not require B&J to pay out income. The court also discounted the value of Bobby's interest in B&J by 35% to account for Bobby's lack of control over the business due to his undivided 50% interest. The District Court counted against Jenny in its property apportionment both the net proceeds of a retirement account that she cashed out after the parties' separation and the equity in a house that she bought using the retirement account proceeds as a down payment. Jenny appeals and Bobby cross-appeals.

## STANDARD OF REVIEW

¶14 We review a district court's distribution of marital property and child support award to determine whether the court's findings of fact are clearly erroneous. *Bock v. Smith*, 2005 MT 40, ¶ 14, 326 Mont. 123, 107 P.3d 488. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Bock*, ¶ 14. Absent clearly erroneous findings, we will affirm the district court unless we identify an abuse of discretion. *Bock*, ¶ 14. A district court abuses its discretion when it acts arbitrarily without conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice. *In re Marriage of Crilly*, 2005 MT 311, ¶ 10, 329 Mont. 479, 124 P.3d 1151. We review a district court's conclusions of law to determine whether those

4

conclusions are correct. *In re Marriage of Bartsch*, 2007 MT 136, ¶ 9, 337 Mont. 386, 162 P.3d 72.

## DISCUSSION

¶15 *Did the District Court incorrectly include Bobby's interest in B&J Properties in the marital estate?*

¶16 Section 40-4-202(1), MCA, governs a district court's division of property in a marital dissolution. The district court shall "equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title . . . is in the name of the husband or wife or both." Section 40-4-202(1), MCA. The district court must consider many factors in its apportionment, including the duration of the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; custodial provisions; whether the apportionment is in lieu of or in addition to maintenance; and the opportunity of each party for future acquisition of capital assets and income. Section 40-4-202(1), MCA. The court also shall consider the contribution of a spouse as a homemaker or to the family unit. Section 40-4-202(1), MCA.

¶17 Section 40-4-202(1), MCA, also governs the court's equitable distribution of property acquired prior to the marriage or property acquired in exchange for property acquired before the marriage. For prior acquired property, the court shall consider the contributions of the other spouse to the marriage, including: (a) the nonmonetary contribution of a homemaker; (b) the extent to which such contributions have facilitated the maintenance of this property;

5

and (c) whether the property division serves as an alternative to maintenance arrangements. Section 40-4-202(1)(a)–(c), MCA.

¶18 Bobby argues that his interest in B&J constitutes prior acquired property, as it was "traceable exclusively to the premarital entity Williams Enterprises." Bobby contends that B&J "was capitalized solely with monies from Williams Enterprises and $50,000 each from Bobby and [J.E.] Williams from prior savings." The District Court acknowledged that most of the business properties "find their genesis in J.E. Williams, Mr. Williams' dad," and "significantly pre-date[] the marriage." The court noted that "B&J, however, came into existence shortly after the marriage." The court included as apportionable property the B&J properties outside of Billings and acquired during the marriage "given M.C.A. 40-4-202 considerations and the fact that the marital home secures a line of credit which paid at least some of the taxes passed through to Mr. Williams" from B&J.

¶19 The District Court determined that the Billings properties constituted a pre-marital asset for Bobby. Jenny does not challenge the District Court's decision to exclude the B&J properties in Billings from the marital estate. Bobby challenges the court's decision to include any portion of the B&J properties in the marital estate. As a result, for the purposes of this opinion, we will refer to those B&J properties that the court included in the marital estate simply as B&J.

¶20 Bobby conceded that, according to tax returns, B&J officially came into existence on January 9, 1995, six months after the marriage. B&J acquired during the marriage all of the properties that the court included in the marital estate. Bobby testified that during the

6

marriage he personally had guaranteed the loans that he and his dad used to acquire the B&J properties. Substantial credible evidence supports the District Court's determination that B&J was not prior acquired property. *Bock*, ¶ 14.

¶21 Bobby insists that the court abused its discretion when it apportioned part of B&J to Jenny, because "Jenny Williams put no money into B&J properties, nor did she provide any labor, services, or contributions of any kind whatsoever to its preservation, maintenance, operation, management, or acquisition." Bobby emphasizes that Jenny "testified at trial that she didn't even know about B&J properties until the divorce proceedings."

¶22 The District Court possessed "broad discretion" in its equitable apportionment of the Williams's property. *Bartsch*, ¶ 9. The District Court properly considered the applicable statutory factors in equitably dividing the Williams's property. Section 40-4-202(1), MCA. The court concluded that a number of factors argued toward apportioning to Jenny an equitable share of the property. The court noted that Bobby was a successful businessman, and that Jenny had "a high school education, has never worked outside the home, has few vocational skills, is not particularly employable and has virtually no estate outside this marriage." The court stated that Jenny's role as homemaker had "facilitated the maintenance of property by enabling [Bobby] to concentrate on business." The court emphasized that it intended "to set aside the property in lieu of maintenance." *See* § 40-4-202(1), MCA. Substantial credible evidence supports the court's decision to include B&J properties in its equitable apportionment of the couple's property. *Bock*, ¶ 14; § 40-4-202(1), MCA.

¶23    Moreover, the District Court properly could include B&J in the marital estate even if B&J constituted pre-marital property.  Section 40-4-202(1)(c), MCA, "makes clear [that] pre-acquired property can be distributed to a non-acquiring spouse *in lieu of maintenance*, regardless of whether she contributed to its increase in value, if 'the property division serves as an alternative to maintenance arrangements.'" *In re Marriage of Rolf*, 2003 MT 194, ¶ 22, 316 Mont. 517, 75 P.3d 770 (emphasis in original).  The district court must state clearly its intent to award the property in lieu of maintenance and make necessary findings supporting an award of maintenance.  *Rolf*, ¶¶ 22-23.

¶24    The District Court emphasized that it "intend[ed] to set aside property to Ms. Williams in lieu of maintenance."  The District Court properly considered the factors delineated in § 40-4-203, MCA, in determining maintenance awards.  The District Court's decision to include B&J in the marital property was not clearly erroneous.  *Bock*, ¶ 14.

¶25    *Did the District Court improperly reduce Bobby's income for the calculation of child support based on the fact that Bobby derived a portion of his income from B&J Properties?*

¶26    Jenny argues that the District Court improperly reduced Bobby's child support obligation to reflect the portion of Bobby's income derived from B&J.  The court recognized that Bobby had "yearly taxable income from B&J that runs his taxable income up to $200,000 to $300,000 or greater."  The court noted, however, that B&J was a sub-chapter S corporation and stated that because Bobby was a 50% owner, he could "not require or force B&J to pay out the income on which he is taxed and to date B&J has paid very little to the owners."  The court added that "of course, when and if B&J pays out income on a regular

8

basis, child support may be recalculated." The court opined that the "child support guidelines do not contemplate including passive, taxable but not received, not spendable income which the recipient does not control." The District Court determined that Bobby should pay $1000 per month in child support, based upon $110,000 as Bobby's income.

¶27 Section 40-4-204, MCA, governs a district court's resolution of child support issues. The district court must use the guidelines in all cases unless the court finds by clear and convincing evidence that applying the guidelines would be unjust to the child or the parties. Section 40-4-204(3)(a), MCA; *In re Marriage of Albinger*, 2002 MT 104, ¶ 12, 309 Mont. 437, 47 P.3d 820. If the court finds that the guideline amount is unjust or inappropriate in a particular case, it must state its reasons for the record. Section 40-4-204(3)(b), MCA.

¶28 Admin. R. M. 37.62.106 guides the court in determining income for child support purposes. Income for child support includes actual income, imputed income, or any combination thereof that fairly reflects a parent's resources available for child support. Admin. R. M. 37.62.106(1). Actual income includes "economic benefit from whatever source derived," including, but not limited to, income from salaries, wages, earnings, profits, dividends, and pensions. Admin. R. M. 37.62.106(2).

¶29 Bobby points to *Gray v. Gray*, 242 Mont. 69, 788 P.2d 909 (1990), to support his contention that his income from B&J did not constitute actual available disposable income. The wife in *Gray* argued that the district court improperly had failed to consider for child support calculation purposes certain income that the husband had declined to report on his tax returns. The income consisted of employment benefits, the value of unsold grain, and

9

wages from driving a truck. *Gray*, 242 Mont. at 72, 788 P.2d at 911. This Court determined that the district court had abused its discretion when it did not include the income in the child support formula. *Gray*, 242 Mont. at 72, 788 P.2d at 911. The Court stated that when determining income under the guidelines, "it is disposable income of the parent, and not their income tax returns alone, which must be considered by the Court." *Gray*, 242 Mont. at 73, 788 P.2d at 912. The Court emphasized that the district court "should have looked beyond the tax returns," although "tax returns are a valuable tool in the determination of the child support." *Gray*, 242 Mont. at 75, 788 P.2d at 913.

¶30 The husband in *Albrecht v. Albrecht*, 2002 MT 227, 311 Mont. 412, 56 P.3d 339, deducted a number of business expenses on his tax return. The district court disregarded the tax return as evidence of the husband's income. *Albrecht*, ¶ 5. The district court noted "the tendency of taxpayers to minimize income to avoid tax liability." *Albrecht*, ¶ 16. This Court concluded that the district court was not required to accept the tax returns as verification of income. *Albrecht*, ¶ 18. The "parent's disposable income rather than taxable income" constitutes the income with which a court is concerned for child support purposes. *Albrecht*, ¶ 17. The Court pointed to evidence indicating that the husband's tax returns were unreliable for child support purposes due to the aggressive manner in which he had deducted the expenses and the commingling of personal and business expenses. *Albrecht*, ¶ 18.

¶31 A district court must determine income for child support purposes "in a realistic manner, taking into account the actual situation of the parties." *Albrecht*, ¶ 7. In *Gray* and *Albrecht*, the parent's taxable income was lower than their actual disposable income due

either to the omission of income from the tax returns or to overly aggressive deductions. *Gray*, 242 Mont. at 72, 788 P.2d at 911; *Albrecht*, ¶¶ 4-5. Bobby attempts to apply the principle from *Gray* and *Albrecht* to a distinguishable situation. Bobby claims that his taxable income was much higher than his actual disposable income. The record indicates that Bobby and his father chose to spend B&J's income on items other than dividends. B&J maintained a private plane. Bobby used $200,000 in B&J funds to buy a condominium in Arizona. Bobby and his father also paid down B&J's debt by nearly $400,000 each year. This decision to pay down B&J's debt essentially increased Bobby's net worth by approximately $200,000 each year.

¶32 This Court faced situations in *Gray* and *Albrecht* where the parents manipulated their tax returns to minimize tax liability by underreporting income or aggressively deducting expenses. *Gray*, 242 Mont. at 72, 788 P.2d at 911; *Albrecht*, ¶¶ 4-5. The Court recognized that a trial court should consider disposable income rather than taxable income in order to determine income realistically for child support purposes. *Gray*, 242 Mont. at 73, 788 P.2d at 912; *Albrecht*, ¶ 17.

¶33 The closely held corporation also presents a situation susceptible to substantial manipulation. In the case of a closely held corporation, however, a court's failure to consider taxable income increases the possibility of manipulation. The District Court decided not to include Bobby's taxable income from B&J as child support income because B&J did not have to pay out money to Bobby. B&J instead could use the money for other purposes, including paying down its debt or reinvesting in the corporation. The court then

11

tied any future decision by B&J to pay out income with a corresponding increase in Bobby's child support obligation. The District Court's decision provides Bobby and his father with substantial incentive to spend B&J's income on anything other than dividends. The District Court on remand should use Bobby's tax returns, B&J's financial statements, and any other relevant information to determine objectively Bobby's income for child support purposes.

¶34 *Did the District Court improperly discount by 35% the value of Bobby's interest in B&J for the purposes of the distribution of marital property in order to reflect Bobby's lack of control in B&J Properties?*

¶35 The District Court determined that the portion of the B&J properties subject to apportionment had "a net value of $3,360,930 and Mr. Williams' 50% interest is $1,680,465." The court reduced the value of Bobby's interest by 35%, however, "to reach an equitable value for apportionment." The court emphasized that Bobby had an undivided 50% interest and "lack[ed] enough control to operate the business without the concurrence of his dad." The court noted that "a non-controlling interest in a family business is not saleable at face value."

¶36 Jenny relies on *Buxbaum v. Buxbaum*, 214 Mont. 1, 8, 692 P.2d 411, 414 (1984), to support her argument that "discounting for lack of control is not allowed when the underlying valuation is asset-based." Jenny contends that this Court "has steadfastly followed this rule without any apparent exception." Bobby "recognize[s] that this precedent exists in Montana," and concedes that "perhaps the court's rationale . . . was phrased inartfully." Bobby argues that the court simply used its equitable powers to lower the value

12

of B&J subject to apportionment rather than determine a value and equitably distribute that amount. *See Bartsch*, ¶ 9; § 40-4-202(1), MCA. Bobby notes that "[t]he court could have stated that 65% [of B&J] was included in the marital estate or simply concluded that Jenny was entitled to the value of 32.5% of the value of Bobby's interest" in B&J.

¶37   This Court has condoned discounting when the trial court estimated the market value of the stock because there was no market value on which to rely. *See Buxbaum*, 214 Mont. at 8, 692 P.2d at 414; *see also In re Marriage of Johnston*, 223 Mont 383, 726 P.2d 322 (1986). A review of this precedent makes it clear, however, that lack of a reliable market value merely represents one consideration in a court's determination of whether it should discount a parties' interest in a closely held corporation.

¶38   The wife in *In re Milesnick*, 235 Mont. 88, 97, 765 P.2d 751, 757 (1988), relied on *Buxbaum* for the proposition that discounting stock is improper whenever the market value is founded on net asset value. This Court disagreed: "This is not so. Whether a discount is proper depends on the facts of the case, not on the method used to ascertain the underlying value of the stock." *In re Milesnick*, 235 Mont. at 97, 765 P.2d at 757. The Court stated that "[a] discount for a minority interest is appropriate when the minority shareholder has no ability to control salaries, dividends, profit distributions, and day-to-day corporate operations." *In re Milesnick*, 235 Mont. at 97, 765 P.2d at 757; *see also In re Marriage of Davies*, 266 Mont. 466, 476-77, 880 P.2d 1368, 1375 (1994).

¶39   The wife in *In re Milesnick*, 235 Mont. at 97, 765 P.2d at 756, contended that the district court improperly had discounted the value of the parties' stock in the family ranch.

This Court affirmed the district court's discounting of the Milesnicks' stock. *In re Milesnick,* 235 Mont. at 98, 765 P.2d at 757. The Court noted that "there is no doubt that the [Milesnicks] were minority shareholders." *In re Milesnick*, 235 Mont. at 97, 765 P.2d at 757. The Court emphasized that the Milesnicks together only owned a little over 10 percent of the total stock of the corporation. *In re Milesnick*, 235 Mont. at 98, 765 P.2d at 757. The husband worked with his parents on the ranch and had some input into day-to-day operations, but the parents had final say on all major decisions. *In re Milesnick*, 235 Mont. at 98, 765 P.2d at 757.

¶40    Bobby owned 50% of B&J. Bobby and his father possessed equal power "to control salaries, dividends, profit distributions, and day-to-day corporate operations." *In re Milesnick*, 235 Mont. at 97, 765 P.2d at 757. Bobby used B&J funds to service and fly the company airplane and to stay current as a pilot. Bobby's alleged lack of control in B&J occurred only after his father took the company checkbook from Bobby after Bobby had spent $200,000 for a down payment on a condominium in Arizona. The District Court improperly discounted the value of Bobby's interest in B&J. *Bock*, ¶ 14. The District Court on remand should consider the entire value of Bobby's interest in that portion of the B&J properties included in the marital estate in equitably reapportioning the Williams's marital estate.

¶41    *Did the District Court's property apportionment incorrectly double count against Jenny the retirement fund that she cashed out after the separation?*

14

¶42 Jenny withdrew $67,706 after taxes from a 401(k) and IRA in Bobby's name after the parties' separation. The parties had stipulated that the District Court would count the net amount that Jenny had withdrawn from the accounts against "whatever amount of marital property [the court] would otherwise determine [Jenny] was entitled to." The District Court counted against Jenny the $67,706 from the retirement fund. The court also counted against Jenny in its property apportionment $80,324 in equity from a town house at 3451 Dunlop Avenue [Dunlop property] that she bought shortly after cashing out the retirement accounts.

¶43 Jenny argues that the District Court's apportionment constituted double counting of the proceeds of the retirement accounts. Bobby suggests that Jenny may not have used the retirement funds towards the Dunlop property. Bobby's Proposed Finding of Fact No. 44 stated in part that "Jenny used [the proceeds of the retirement funds] to purchase a home at 3451 Dunlop Avenue." The court adopted Jenny's Proposed Finding of Fact No. 29, which provided in part that "[p]er Stipulation and Court order, Bobby provided the Morgan Stanley and Raymond James accounts to Jenny, which Jenny utilized to purchase the 3451 Dunlop Avenue town home."

¶44 Bobby strenuously objected to Jenny's purchase of the Dunlop property before trial. Bobby's counsel asked Jenny: "Isn't it true, you're going to hand $339,000 to the Buschers to buy [the Dunlop property]?" Jenny replied: "I have a loan." Bobby's counsel then stated: "Well, $263,000 is a loan and the rest of it is this retirement money." Bobby's counsel later objected to Jenny "taking all of the money that she's got, $80,000 in cash, and devoting it all to one thing."

15

¶45 The record indicates that Jenny used the $67,706 from the retirement funds as a down payment on the Dunlop property. The District Court properly counted against Jenny the $80,324 in equity in the Dunlop property. The court improperly double counted the retirement money when it also counted against Jenny the original $67,706 from the retirement funds. On remand, the District Court should count only the $80,324 against Jenny in its property apportionment.

## CONCLUSION

¶46 We remand and direct the District Court to re-calculate Bobby's child support obligation and reapportion the Williams's entire marital estate. The marital estate includes the full value of Bobby's interest in the portion of the B&J properties that the court earlier determined should be included in the Williams's marital estate. Our decision likely affects the equitable factors that the District Court must consider when apportioning the Williams's marital estate. Section 40-4-202(1), MCA. The District Court should exercise its "broad discretion" to apportion equitably the estate in a manner consistent with this opinion. *Bartsch*, ¶ 9.

¶47 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA O. COTTER

16

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON