DA 12-0639

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 194

IN RE THE MARRIAGE OF

BETH M. PARKER,

> Petitioner and Appellant,

and

JAMES G. PARKER,

> Respondent and Appellee.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR-11-18
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:

> Terry Wallace, Attorney at Law, Missoula, Montana

> For Appellee:

> Jamie J. McKittrick, Wells & McKittrick, Missoula, Montana

Submitted on Briefs:  May 29, 2013

Decided:  July 16, 2013

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Beth Parker appeals from an Order of the District Court for the Fourth Judicial District, Missoula County, upholding the Standing Master's Findings of Fact and Conclusions of Law in the parties' dissolution action. We affirm.

¶2     The parties raise the following issues on appeal:

¶3     1. Whether the District Court abused its discretion by excluding Jim's interest in his mother's trust from the marital estate.

¶4     2. Whether the parties entered into a post-nuptial agreement.

¶5     3. Whether the District Court equitably distributed the marital estate pursuant to § 40-4-202, MCA.

¶6     4. Whether Jim is entitled to attorney's fees and costs on appeal in this matter.

**Factual and Procedural Background**

¶7     The parties were legally married on June 18, 1999. At the time of the parties' marriage, Beth owned her own home and lived there with her two minor children from a previous marriage. Beth contends that the parties were actually married by common law one year earlier, on or about July 1, 1998, when she claims Jim moved into her home. Jim claims, however, that he did not move into Beth's home until after their June 1999 marriage. No children were born to the parties during their marriage.

¶8     In December 2001, the parties decided to move into a home that Jim had purchased in the Rattlesnake area of Missoula, and to sell Beth's home. The proceeds from the sale of Beth's home were used to pay bills and for other expenses.

¶9   Both Beth and Jim worked throughout their marriage. Beth originally worked at Mountain Press Publishing, but she left that position and returned to school. She obtained a graduate degree that allowed her to provide professional counseling services. Beth is now a counselor in private practice. Jim owns his own company, Westridge Creative, LLC. He also worked part-time for the nonprofit organization Tamarack Grief Resource Center. Both parties testified that they contributed to Jim's business over the course of their marriage. And, both parties testified that they used their credit cards to take various trips and to pay for marital expenses.

¶10   Jim received an inheritance from his godfather during the marriage. Jim testified that some of this money was used to pay off part of the parties' credit card debt, and the remainder was used for "household needs and goods." In addition, Jim's mother gifted him money at regular intervals. Jim testified that this money went toward "household uses and expenses." Also, Jim's mother had a trust entitled the Elizabeth G. Parker Trust which originally provided that after her death, any remaining trust property should go to her husband, or, if he did not survive her, then to her issue—i.e., Jim and his brother.

¶11   The parties lived together in the Rattlesnake home until the date of their separation, January 2010, when Beth moved out. Beth filed a Petition for Dissolution of Marriage on January 7, 2011, and the matter was referred to Standing Master Susan Leaphart on February 17, 2011.

¶12   Jim continued to live in the Rattlesnake home paying the mortgage, maintenance and all other expenses related to the home until September 2011. Jim testified that at that time, he and Beth agreed that neither party would live in the home, that they would share

3

the cost of the mortgage, and that they would sell the home. Beth and Jim listed the home with a realtor for $325,000. They reduced the listing price several times until it was finally listed at $275,000. Jim testified that there was a mortgage on the home in the amount of $130,000. In November 2011, Beth decided to move back into the Rattlesnake home, and advised the realtor to take the home off the market.

¶13 On December 14, 2011, the District Court issued an Order denying Beth's motion for inclusion of Jim's mother's trust in the marital estate. The court determined that any interest Jim might receive from the trust did not impact the marital estate because Jim's interest had not vested. Instead, the court determined that Jim's interest in the trust was contingent because the trust could be modified by his mother at any time.

¶14 An evidentiary hearing was held before the Standing Master on April 27, 2012. Thereafter, the Standing Master filed her Findings of Fact and Conclusions of Law on June 5, 2012, wherein she determined that the Rattlesnake home should be sold, and that the parties pay from the proceeds of the sale the underlying note, the realtor's fees, the parties' credit card debt and the back taxes. After payment of all of these items, the parties would split the remainder. The Standing Master also determined that each party should be responsible for their own student loan debt and business loans.

¶15 Beth filed her objections to the Standing Master's findings and conclusions on June 18, 2012. She specifically objected to the conclusion that the marital home should be sold and the proceeds split between the parties. She argued that she has no ability to acquire future income and assets, and that pursuant to § 40-4-202, MCA, the home should be awarded to her. Beth also argued that the findings and conclusions favored Jim

4

at her expense because the back taxes owing were Jim's share of the parties' tax obligation, and that Jim stopped paying for his share of the credit card debt several months prior to the hearing in this matter leaving Beth to make all of the payments. Thus, Beth complained that under the Standing Master's findings and conclusions, Beth would be assuming a larger portion of the parties' debt than Jim.

¶16    Jim responded to Beth's objections arguing that the Standing Master, after considering all of the evidence, equitably distributed all assets and liabilities of both parties and chose not to award the marital home to Beth.  In addition, Jim pointed out that Beth did not provide any evidence to indicate that the back taxes were Jim's obligation exclusively.

¶17    A hearing on Beth's objections was held on September 10, 2012.  On September 17, 2012, Beth moved to reopen the evidentiary hearing to permit discovery and presentation of evidence regarding Jim's interest in his mother's trust.  Beth argued that because there had already been some distribution of the trust to Jim, at least some part of the trust had vested in Jim.  Thus, according to Beth, the District Court must consider all information about the trust to insure an equitable distribution of the marital estate.

¶18    On September 26, 2012, the District Court issued an Order denying Beth's request to include Jim's mother's trust in the marital estate.  In addition, the court denied Beth's objections and upheld the Standing Master's Findings of Fact and Conclusions of Law.

¶19    Beth appeals.

**Standard of Review**

¶20 We review a district court's findings of fact in a dissolution proceeding to determine whether they are clearly erroneous. *In re Marriage of Crilly*, 2009 MT 187, ¶ 9, 351 Mont. 71, 209 P.3d 249. A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Crilly*, ¶ 9 (citing *Bock v. Smith*, 2005 MT 40, ¶ 14, 326 Mont. 123, 107 P.3d 488).

¶21 Absent clearly erroneous findings, we will affirm a district court's division of property unless we identify an abuse of discretion. *Crilly*, ¶ 9 (*In re Marriage of Payer*, 2005 MT 89, ¶ 9, 326 Mont. 459, 110 P.3d 460).

> "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461, 110 L. Ed. 2d 359 (1990); *see also Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 17, 351 Mont. 464, 215 P.3d 649 (our review is plenary to the extent that a discretionary ruling is based on a conclusion of law).

*Wohl v. City of Missoula*, 2013 MT 46, ¶ 28, 369 Mont. 108, 300 P.3d 1119.

¶22 In addition, we review conclusions of law de novo, to determine whether a district court's interpretation of the law is correct. *Schwartz v. Harris*, 2013 MT 145, ¶ 15, 370 Mont. 294, ___ P.3d ___ (citing *In re Marriage of Williams*, 2009 MT 282, ¶ 14, 352 Mont. 198, 217 P.3d 67).

**Issue 1.**

¶23 *Whether the District Court abused its discretion by excluding Jim's interest in his mother's trust from the marital estate.*

6

¶24    On December 14, 2011, the District Court issued an Order denying Beth's motion to include Jim's mother's trust in the marital estate. The court determined that any interest Jim might receive from the trust was contingent because the terms of the trust could be modified by Jim's mother at any time. Consequently, the court concluded that Jim's interest in the trust had not vested.

¶25    Beth argues that the District Court abused its discretion by excluding Jim's mother's trust from the parties' marital estate. Beth maintains that by doing so, the court refused to enforce the parties' post-nuptial agreement regarding the parties' credit card debt, skewed the final financial disclosures, and failed to consider Beth's opportunity to acquire future capital assets and income. Thus, Beth contends that the resulting marital distribution was inequitable.

¶26    Jim argues on the other hand that the expectation of an inheritance, such as his potential inheritance of a portion of his mother's trust, is not to be included in the marital estate. Jim maintains that his interest in his mother's trust is contingent upon future events such as Jim surviving his mother, and his mother not exercising her power to revoke or amend the trust to delete Jim's interest. Thus, contrary to Beth's assertions, Jim contends that his interest in the trust is merely an *expectation* of an inheritance, nothing more.

¶27    Beth relies on § 40-4-202, MCA, in support of her contention that the trust must be included in the marital estate. This statute provides, in pertinent part:

> **Division of property.** (1) In a proceeding for dissolution of a marriage . . . the court, without regard to marital misconduct, shall . . . finally equitably apportion between the parties the property and assets

*belonging to* either or both, however and whenever *acquired* and *whether the title thereto is in the name of the husband or wife or both.* In making apportionment, the court shall consider the duration of the marriage and prior marriage of either party; the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; custodial provisions; whether the apportionment is in lieu of or in addition to maintenance; and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution or dissipation of value of the respective estates and the contribution of a spouse as a homemaker or to the family unit. In dividing property *acquired* . . . by gift, bequest, devise, or descent . . . the court shall consider those contributions of the other spouse to the marriage, including:

      (a) the nonmonetary contribution of a homemaker;

      (b) the extent to which such contributions have facilitated the maintenance of this property; and

      (c) whether or not the property division serves as an alternative to maintenance arrangements. [Emphasis added.]

¶28 When interpreting the language of a statute, we first look to the plain meaning of the words it contains. *In re D.B.J.*, 2012 MT 220, ¶ 40, 366 Mont. 320, 286 P.3d 1201 (citing *In re L.M.A.T.*, 2002 MT 163, ¶ 18, 310 Mont. 422, 51 P.3d 504; *City of Great Falls v. DPHHS*, 2002 MT 108, ¶ 16, 309 Mont. 467, 47 P.3d 836). When the language is clear and unambiguous, the statute speaks for itself and we will go no further. *D.B.J.*, ¶ 40 (citing *Clarke v. Massey*, 271 Mont. 412, 416, 897 P.2d 1085, 1088 (1995)). Determining plain meaning requires that courts logically and reasonably interpret language by giving words their usual and ordinary meaning. *D.B.J.*, ¶ 40 (citing *Werre v. David*, 275 Mont. 376, 385, 913 P.2d 625, 631 (1996)).

¶29 Contrary to Beth's assertions, a plain reading of this statute clearly indicates that it refers to property *already acquired* by the parties that is titled in the name of either or both spouses. It does not contemplate the consideration of a *possible* future inheritance.

8

¶30     In *In re Marriage of Beadle*, we held that "a spouse's *possible* inheritance is never properly included in the marital estate nor considered in dividing the marital estate . . . ." *Beadle*, 1998 MT 225, ¶ 43, 291 Mont. 1, 968 P.2d 698 (emphasis added).  In *Beadle*, this Court excluded the revocable living trusts of the husband's parents from the marital estate noting that the husband's interest in the trusts was contingent and could not be ascertained until the deaths of his parents.  *Beadle*, ¶ 43.

¶31     In the case before us on appeal, Jim's parents created the Henry M. Parker Trust and the Elizabeth G. Parker Trust in 1994.  These trusts provided for the distribution of the trust assets to the surviving spouse upon the death of the first spouse.  Jim's mother received the trust assets from the Henry M. Parker Trust when Jim's father passed away.  Article I of the Elizabeth G. Parker Trust provided that Elizabeth, Jim's mother, reserved the right "to revoke or amend this trust or to withdraw, mortgage, pledge or assign the assets of the trust at any time during my life by written instrument signed by me and delivered to the Trustees."

¶32     In September 2009, Jim's mother resigned as Trustee of the Elizabeth G. Parker Trust, and her sons, Jim and David, became the successor Trustees of the trust.  Beth argues that because Jim became a Trustee of the trust in 2009, his mother no longer has any power of appointment.  Instead, Beth claims that that power passed to Jim and his brother before this action commenced.

¶33     As Donor of the trust, Jim's mother may make amendments to the instrument and remove its beneficiaries despite relinquishing her role as Trustee.  Furthermore, if Jim's mother should use up the corpus of the trust during her lifetime, Jim will not receive

9

anything from the trust. In fact, in March 2011, Jim's mother exercised her right to amend the trust and executed a "First Amendment to the Elizabeth G. Parker Trust." The amended trust, like the original trust before it, provided that Elizabeth "may at any time revoke, alter or amend this instrument in whole or in part by a written notice addressed to the Trustee . . . ."

¶34 In the original trust, Elizabeth named her husband as the beneficiary, and if he died before her or disclaimed any interest in the trust, the property was to be distributed to "my issue who survive me." In addition, Elizabeth provided in her original trust document that if no issue survived her, the Trustee was to distribute her remaining property to certain charitable organizations. In the amended trust, Elizabeth named her two sons as the principal beneficiaries of the trust, but if either or both of her sons did not survive her, Elizabeth named several other individuals as beneficiaries under the trust. Elizabeth also changed the charitable organizations that would benefit under the trust if any property remained undistributed to her other named beneficiaries.

¶35 Thus, even though Jim is a Trustee of his mother's trust, Jim's interest under the trust may be revoked or amended by his mother at any time. Consequently, Jim's interest is not a vested remainder[1] as Beth claims. Not until Jim's mother dies—assuming she had not removed Jim as a beneficiary under the trust prior to her death—will the trust

---

[1] A vested remainder is a remainder "which is limited to an ascertained person in being, whose right to the estate is fixed and certain, and which does not depend upon the happening of any future event, but whose enjoyment of the estate is postponed to some future time." Steven H. Gifis, *Law Dictionary* 507 (Barron's Educational Services, Inc., 2d ed., 1984) (brackets omitted).

become irrevocable and Jim's interest will be vested. Jim will not know the extent of his inheritance, if any, until his mother's death.

¶36 Beth relies on this Court's decision in *In re Marriage of Foreman*, 1999 MT 89, 294 Mont. 181, 979 P.2d 193, to support her contention that Jim's interest in his mother's trust must be included in the marital estate. However, *Foreman* is distinguishable from the instant case because the inherited interest at issue in *Foreman* was already fixed and certain. In that case, Ronald Foreman's father passed away leaving a one-third interest in the family farm to each of his children subject to a life estate granted to Ronald's mother. Unlike the instant case where Jim's interest in his mother's trust could be amended or revoked at any time, Ronald's one-third interest in the family farm could not be amended or revoked. As we indicated in ¶ 30 of this Opinion, "a spouse's *possible* inheritance is never properly included in the marital estate nor considered in dividing the marital estate . . . ." *Beadle*, ¶ 43 (emphasis added).

¶37 Accordingly, we hold that the District Court did not abuse its discretion by excluding Jim's interest in his mother's trust from the marital estate.

**Issue 2.**

¶38 *Whether the parties entered into a post-nuptial agreement.*

¶39 Beth contends that the parties entered into a post-nuptial agreement, the terms of which were that if Beth would assume the parties' credit card debt in her name for everyday expenses, Jim would repay her from the proceeds of his mother's trust. On the other hand, Jim contends that Beth failed to present any evidence establishing the existence of a post-nuptial agreement.

11

¶40 Beth cites § 40-2-301, MCA, in support of her contention that a post-nuptial agreement existed between the parties. Section 40-2-301, MCA, provides:

> **Husband and wife may contract.** Either husband or wife may enter into any engagement or transaction with the other or with any other person respecting property which either might, if unmarried, subject in transactions between themselves to the general rules which control the actions of persons occupying confidential relations with each other, as defined by the provisions of this code relative to trusts.

¶41 The Standing Master took into consideration the varying viewpoints of the parties regarding the existence of any post-nuptial agreement when she pointed out in her Findings of Fact and Conclusions of Law that "Jim cannot have participated in the accumulation of credit card debt over the years, consistently assured Beth the debt could be paid, and then, unilaterally, stop contributing to any payment on that credit card debt." The Standing Master also stated: "Beth cannot claim to have been a part of this marriage since 1998 and then ask, almost fourteen years later to be reimbursed for all of the financial effort she put into the marriage."

¶42 It is unnecessary, however, for this Court to determine whether a post-nuptial agreement existed between the parties because any such agreement was contingent upon Jim inheriting under his mother's trust. Jim testified that

> [w]e couldn't make a promise as [Beth] alleges that it would be paid off through money I'm going to get from my mother because we had both read these documents, we both understood that there's no guarantee that anybody, myself, my brother will ever receive any money from that. If my mother . . . dies without spending it down, then maybe there's money, maybe there's not, but it has – there's no guarantee that there's ever going to be any money.

12

¶43 Had the parties remained married, the alleged statements by Jim to the effect that the credit card debt would be paid out of his inheritance from his mother's trust may have come to pass. However, as we set forth in the previous issue, Jim has only a possibility of inheriting under the trust. Any such future inheritance is not fixed or certain since Jim's interest under the trust may be revoked or amended by his mother at any time. And, as testified to by Jim, if Jim's mother should use up the corpus of the trust during her lifetime, Jim will not receive anything from the trust.

**Issue 3.**

¶44 *Whether the District Court equitably distributed the marital estate pursuant to § 40-4-202, MCA.*

¶45 Beth contends that the factors listed in § 40-4-202, MCA, must be considered and referred to in the District Court's findings and conclusions. She maintains that the District Court abused its discretion when it failed to make any findings or conclusions to the effect that Beth would never have any opportunity for future acquisition of capital assets and income unless she was allowed to retain the Rattlesnake house.

¶46 A district court is vested with broad discretion to apportion a marital estate in a manner equitable to each party under the circumstances. *In re Marriage of Tummarello*, 2012 MT 18, ¶ 23, 363 Mont. 387, 270 P.3d 28 (citing *In re Marriage of Bartsch*, 2007 MT 136, ¶ 9, 337 Mont. 386, 162 P.3d 72; *In re Marriage of Clark*, 2003 MT 168, ¶ 20, 316 Mont. 327, 71 P.3d 1228). The specific factors the court must consider are set forth in § 40-4-202(1), MCA, which provides:

> In making apportionment, the court shall consider the duration of the marriage and prior marriage of either party; the age, health, station,

13

occupation, amount and sources of income, vocational skill, employability, estate, liabilities, and needs of each of the parties; custodial provisions; whether the apportionment is in lieu of or in addition to maintenance; and the opportunity of each for future acquisition of capital assets and income.

¶47 Based upon these factors, the statute directs the district court to "finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both." *Tummarello*, ¶ 23 (quoting § 40-4-202(1), MCA). However, an equitable division does not require that every marital asset or liability be split evenly. *In re C.W.,* 2012 MT 212, ¶ 18, 366 Mont. 278, 291 P.3d 1092.

¶48 In this case, we conclude that the Standing Master's Findings of Fact and Conclusions of Law did set forth all of the pertinent factors enumerated in § 40-4-202(1), MCA. The Standing Master discussed the duration of the parties' marriage, including the discrepancy regarding the actual date of their marriage; the age, station, occupation, amount and sources of income, vocational skills and employability of both Beth and Jim; Jim's health problems; each parties' liabilities; and each parties' needs. As to the factor regarding "future acquisition of capital assets and income," Beth fails to note that the statute requires that the court consider the opportunity of *each* party for said future acquisition.

¶49 The Standing Master noted at Finding of Fact No. 28 that "Beth now does not wish the house to be sold and argues that it is her last chance to acquire a home. She wishes to be awarded the home in the distribution of the marital estate . . . ." In addition, the District Court pointed out in its September 26, 2012 Order that Beth objected to the

14

Standing Master's Conclusion of Law No. 10 regarding the sale of the home. The court stated in its Order:

> According to [Beth], "the Court rejected evidence given by Beth that the only way she has any chance of accumulating future income and assets is if the house is not sold but awarded to her [and that she] has no chance of future acquisition of income and assets unless she is awarded the Rattlesnake house."

Nevertheless, the court denied Beth's objections to the Standing Master's findings and conclusions, stating that it had reviewed the tape of the April 27, 2012 hearing before the Standing Master and concluded that "the Standing Master carefully considered the evidence and testimony and arrived at a fair and equitable distribution of the debts and assets of the marriage."

¶50    It is clear from both the Standing Master's findings and conclusions and the District Court's Order that the factor enumerated in § 40-4-202(1), MCA, regarding the "future acquisition of capital assets and income," was carefully considered by both the Standing Master and the District Court. "When a trial court's findings reflect that it properly considered the various factors enumerated in the statute, it will not be held in error." *Tummarello*, ¶ 25 (citing *In re Petition of Fenzau*, 2002 MT 197, ¶ 36, 311 Mont. 163, 54 P.3d 43).

¶51    Accordingly, we hold that the District Court equitably distributed the marital estate pursuant to § 40-4-202, MCA.

**Issue 4.**

¶52    *Whether Jim is entitled to attorney's fees and costs on appeal in this matter.*

15

¶53 Jim contends that he is entitled to his attorney's fees and cost on appeal because Beth's arguments "lack merit, and are frivolous and lacking in good faith." Jim argues that the issues Beth raises on appeal are "groundless" since they "were fully analyzed and addressed in the detailed, complete and accurate" findings of the District Court. Beth argues on the other hand that Jim's claim for attorney's fees and costs is without merit because he does not consider the possibility of "a good faith disagreement on the law."

¶54 This Court may award sanctions on appeal, including attorney's fees and costs, "where the claim for relief is 'frivolous, vexatious, filed for purposes of harassment or delay, or taken without substantial or reasonable grounds.' " *Tummarello*, ¶ 42 (quoting M. R. App. P. 19(5)). Although we have determined that Beth's claims lack merit, we cannot conclude that they were entirely frivolous or lacking in good faith. *See Tummarello*, ¶ 42 (citing *In re Marriage of Chamberlin*, 2011 MT 253, ¶ 26, 362 Mont. 226, 262 P.3d 1097).

¶55 Accordingly, we decline to award Jim his attorney's fees and costs on appeal in this matter.

¶56 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ JIM RICE