FILED

04/04/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0573

DA 15-0573

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2017 MT 78N

IN RE THE MARRIAGE OF:

GREGORY A. JACKSON,

Petitioner and Appellant,

v.

CATHRYN J. (KIT) JACKSON,

Respondent and Appellee.

APPEAL FROM:  District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR-09-624
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Michael Sol, Terry L. Wolfe, Sol & Wolfe Law Firm, PLLP, Missoula, Montana

For Appellee:

David B. Cotner, Datsopoulos, MacDonald & Lind, Missoula, Montana

Submitted on Briefs:  February 8, 2017

Decided:  April 4, 2017

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     Gregory Jackson (Greg) appeals the District Court's Findings of Fact and Conclusions of Law regarding the distribution of marital property arising from the dissolution of his marriage to Cathryn Jackson (Kit).[1]  Greg raises four issues on appeal that we restate as follows:

1. *Whether the District Court erred when it divided the marital estate pursuant to § 40-4-202, MCA.*

2. *Whether the District Court abused its discretion when it rejected the Standing Master's Findings and Conclusions regarding the valuations of businesses included in the marital estate.*

3. *Whether the District Court erred by including Greg's premarital property in its analysis of the marital estate pursuant to § 40-4-202, MCA.*

4. *Whether the District Court erred in rejecting joint tax returns as dispositive evidence of ownership percentages in its analysis of the marital estate pursuant to § 40-4-202, MCA.*

¶3     We affirm the District Court's Findings of Fact, Conclusions of Law, and Decree of Dissolution.

---

[1] Although Greg's Reply Brief was not timely received, we did consider it as part of his appeal.

¶4 Greg and Kit married December 31, 1991, in Helena, Montana, when they were 47 and 38, respectively. On the day the dissolution was entered, Kit was 62 and Greg was 71. Kit was in good health, but Greg's had deteriorated somewhat. This was a second marriage for both Greg and Kit and no children came from it. Neither Kit nor Greg had many assets when they married, but neither did they have many debts. Notably, Greg had recently retired from the State of Montana, and so brought his PERS retirement fund into the marriage. After they married, he added Kit to his health insurance policy as she was finishing school at Carroll College and he was working for a company in Washington.

¶5 Once she graduated in 1992, Kit worked a variety of jobs in the healthcare field, with varying degrees of success. Her experiences included time as an EMT, cardiac charge nurse, and working in pediatric oncology and in a neo-natal ICU. She also worked in home health and multiple hospice businesses. Meanwhile, from 1990-1995, Greg worked full-time for Ritter Construction. Greg and Kit both earned about $40,000 per year at this time. In 1995, Kit received a job offer in Utah, a state where Greg had no employment opportunities. Nevertheless, he agreed to move with her and he eventually found work. While he worked there as a full-time traffic engineer, Greg's salary improved to $70,000 per year. He continued with this salary and position until his and Kit's fortunes substantially improved.

¶6 The couple's fortunes improved when Greg and Kit formed Hospice for Utah (HFU). Greg and Kit differ in their memories of how HFU started, particularly in terms of Greg's role and contribution. Although Greg recalls having to convince Kit to start the

business, he had no medical credentials and no involvement in the medical side of the business. His roles were more supportive and ancillary, running errands, delivering, cleaning and assembling equipment, picking up prescriptions, installing software, and projecting expenditures and income. Much of what Greg did for the company in its formative period was done in his spare time, as he continued to work at his full-time job. Greg also studied regulations and attended conferences and trainings on issues pertinent to running a hospice business. Kit testified too, that he was emotionally supportive and wanted very much for her to make the business successful. Eventually, Greg was able to move back to Montana, receiving periodic funds from the company, but retaining no active role in HFU. He never returned to work at the HFU Utah offices after moving to Montana, and CPAs assumed his previous responsibilities for the cost reports.

¶7     Kit, on the other hand, made substantially greater contributions to HFU. She hired employees, negotiated contracts, and wrote the policy and procedure manual, all in addition to caring for the patients; Kit was the only registered nurse on staff when HFU began. Nonetheless, she managed to establish a large network of critical physician referrals throughout Utah. Additionally, HFU employees sought her guidance and assistance whenever problems with the business arose. Her daily involvement and availability was instrumental in HFU's success. Prior to HFU's beginning, and after it formed, Kit trained in end of life care, adult acute care, hospice training, and hospice administrative training. HFU received its hospice business license in December of 1997.

¶8     HFU prospered very quickly.  As HFU became profitable, it garnered buyout offers from competitors.  Around 2000, the Jacksons declined an offer from Odyssey Corporation of $2 million for HFU.  Odyssey tendered another offer of $4.5 million in 2002, which Greg wanted to accept.  The deal fell through though, as Kit refused to sell.  Their disagreement over the sale to Odyssey signaled the beginning of their marriage's deterioration.  Ultimately, however, Kit and Greg agreed to sell a portion of their interest in HFU to the employees, using an Employee Stock Ownership Program (ESOP).  Kit agreed to the ESOP in an effort to assuage Greg.  There were two sales under the ESOP, each for 31%.  The first sale netted over $1 million, while the second brought $1.4 million.  The Jacksons retained the remaining 38% as a minority interest in HFU.

¶9     The Jacksons moved to Missoula, Montana, in 2002, not long after Greg had heart surgery.  In Missoula, Kit began a similar hospice business, Hospice of Missoula (HOM), after she was approached by and met with several medical providers.  Greg was not involved in Kit's meetings with these providers.  Kit started HOM while she continued to run HFU.  Kit's involvement in HOM mirrored that of HFU—educating employees, negotiating contracts, and generally managing the business.  Her devotion to both businesses necessitated her dividing her time between Missoula and Utah, spending two weeks at a time at each location, even though HFU was at that point staffed by competent management.  To facilitate her extended stays in Utah, Kit purchased a home, which HFU then rented from her. Despite the length of his heart surgery convalescence, Greg's involvement in HOM likewise tracked the support role he had assumed for HFU,

assembling furniture, wiring phones, and researching software for Medicare billing. His limited involvement stemmed in part from Kit's knowledge that he was ready to retire, but he remained available to assist Kit and HOM staff, however they might need him. At trial, witnesses testified that Kit's contributions were essential to the success of HOM and that it would fail without her leadership. Greg called no witnesses to verify his contributions to HOM.

¶10 Greg filed a Petition seeking dissolution of the marriage on August 24, 2009. The District Court referred the case to Standing Master Susan Leaphart on November 25, 2009. After trial, Standing Master Leaphart entered proposed Findings of Fact and Conclusions of Law on May 31, 2012. Kit and Greg both objected to the Standing Master's proposed findings. The matter then went before the Honorable District Court Judge Edward McLean, who held numerous status conferences and hearings. After these proceedings, the District Court entered its own Findings of Fact, Conclusions of Law and Decree of Dissolution on April 30, 2015. Greg filed a Motion to Alter and Amend the District Court's Findings of Fact, Conclusions of Law on June 23, 2015, to which the District Court did not respond and so was deemed denied. Greg timely filed an appeal to this Court on September 18, 2015.

¶11 The District Court made findings that contradicted the findings of the Special Master. The District Court reallocated the marital estate; struck the Standing Master's order that HFU be forced to pay Greg a salary; determined that the Standing Master's valuation of HOM was clearly erroneous; and ordered Kit to purchase Greg's shares in

6

HFU for $400,000, with five years of additional payments. A district court is empowered to reject the findings of a Standing Master when those findings are clearly erroneous. *Anderson v. Deafenbaugh*, 2014 MT 215, ¶¶ 15-19, 376 Mont. 212, 331 P.3d 835. In turn, we review a district court's factual findings in a division of marital property for clear error, while its conclusions of law are reviewed for correctness. *In re Marriage of Funk*, 2012 MT 14, ¶ 6, 363 Mont. 352, 270 P.3d 39. "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake." *In re L.H.*, 2007 MT 70, ¶ 13, 336 Mont. 405, 154 P.3d 622.

¶12 Although Greg objects to the unequal reallocation of the estate, his objection is misplaced as the District Court is tasked under § 40-4-202, MCA, with an equitable division, not an equal division. *In re Marriage of Parker*, 2013 MT 194, ¶ 47, 371 Mont. 74, 305 P.3d 816; *In re Marriage of Garner*, 239 Mont. 485, 488, 781 P.2d 1125, 1127 (1989). Under the provisions of § 40-4-202, MCA, the District Court is vested with broad discretion to formulate an equitable division of marital property under the circumstances that reflects the parties' relative contributions to the marital estate. *In re Marriage of Bartsch*, 2007 MT 136, ¶¶ 9, 19-20, 337 Mont. 386, 162 P.3d 72. Equity, not equality guides that discretion. *Marriage of Garner*, 239 Mont. at 488, 781 P.2d at 1127.

¶13    We note at the outset of our discussion that Greg's first and second issues, whether the District Court erred in its division of marital property, and whether the District Court erred by rejecting the Standing Master's valuation of HOM, are intertwined and appropriate for concurrent discussion.  Here, in a marital estate valued at more than $7 million, the District Court awarded Greg $3.2 million, or 45.7% of the net marital estate, and Kit $3.8 million, or 54.3% of the net marital estate.  Greg's apportionment from the District Court differs by approximately $100,000 from that of the Standing Master.  The difference arises in large part from the District Court's finding that the Standing Master misapprehended the weight of Greg's expert testimony when valuing HOM.  Unlike the Special Master, the District Court noted that Greg's expert failed to account for a necessary salary adjustment if Kit were to leave or be bought out of the business, failed to appropriately account for the risk inherent in the business, failed to consider the impact of the Affordable Care Act's passage on the business, and failed to consider the length of stay of patients, which is critical to a hospice business's cash flow.  Thus, Greg's expert overvalued the worth of HOM and consequently inflated the net value of the marital estate.  The District Court found the Standing Master clearly erred by accepting Greg's expert valuation over Kit's, who did account for all of those factors.  The District Court further concluded, as did the Standing Master, that unrefuted evidence of Kit's greater contributions to the businesses merited a proportionally greater share of their value, and awarded Kit the more substantial share of the estate.  We agree with the District Court that Kit's more substantial involvement in the hospice businesses merited a greater share

8

of their value, and that the Special Master clearly erred by accepting Greg's expert valuation testimony over Kit's.

¶14   Further, the District Court struck the Standing Master's conclusion that HFU should continue paying Greg a salary. The Standing Master concluded Greg should continue to receive compensation as an officer in HFU—$7,000 per month. Greg was not an employee of the corporation, however, and performed no services for it at the time of dissolution. HFU is owned primarily by the ESOP and was not a party to these proceedings. As such, the District Court found the Standing Master clearly erred by issuing such an order as the Court did not have personal jurisdiction over HFU. The District Court further found that to award Greg a greater portion of the remaining assets in order to compensate him for this stricken revenue would improperly punish Kit for the Standing Master's error. We agree with the District Court that the Standing Master clearly erred by ordering HFU to pay Greg a salary when he was not an officer and performed no services for HFU. Additionally, we agree with the District Court's conclusion that the Standing Master lacked personal jurisdiction over HFU and thus could not effectuate such an order, even if it was not in error. Further, we find the District Court's determination that Kit would be unfairly impacted if other marital assets were to be redistributed to compensate Greg for this lost revenue constitutes an equitable division of marital property that was not clearly erroneous.

¶15   The District Court's conclusion that Kit should purchase Greg's shares of HFU for $400,000, with five years of additional payments, was also not clearly erroneous. To

9

mitigate the prolonged dispute between the parties over the valuation of HFU, the District Court ordered a buyout: Kit was to tender an offer to buy Greg's shares in HFU for any amount she chose. Reciprocally, Greg could refuse her tender offer and opt instead to buy Kit's shares for the same amount. This proposition was a structured sale orchestrated by the District Court to which neither Greg nor Kit objected and was designed to alleviate Greg's concern that the Standing Master's order had "stranded" his investment in HFU. We find this structured sale was an equitable means to resolve Greg's concerns. The District Court did not clearly err in ordering it.

¶16    Greg's third issue, whether his premarital property was properly included in the District Court's analysis and division of the marital estate constitutes an issue of well-settled law in Montana since we decided *Funk*. In *Funk*, we concluded that § 40-4-202, MCA, obligates the District Court to equitably apportion all assets of either or both spouses, regardless of by whom and when acquired. The District Court's equitable distribution of this property is subject to the factors enumerated in § 40-4-202, MCA, and the unique factors of each case. *Funk*, ¶ 19. Here, the record shows Greg received an unequal, but equitable distribution that accurately reflected his contribution to the marriage in accordance with the factors of § 40-4-202, MCA. Indeed, the District Court specifically noted that Greg had provided nonmonetary contributions to the business, including giving emotional support and encouragement to Kit when the ventures began. The District Court also found he had contributed in supportive, ancillary roles such as preparing expense reports. Accordingly, we conclude the District Court did

10

not err when it made findings pertinent to § 40-4-202, MCA, and included Greg's premarital property when analyzing and dividing the marital estate in compliance with *Funk*.

¶17　Resolution of Greg's final issue of whether a married couple's tax returns constitute dispositive evidence of an ownership agreement between the parties in a marriage dissolution again turns on compliance with our holding in *Funk* and the intent of § 40-4-202, MCA.　Greg argues that the District Court's distribution ignored the fact that he and Kit each owned half of HFU and HOM, as evidenced by their tax returns and equal distributions over the years.　The District Court, however, is tasked with an equitable division of all marital property, including shares of ownership in a business. Under the statute, the court is to "equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of husband or wife or both."　*Funk*, ¶ 17.　This directive applies to all assets between the parties.　*Funk*, ¶ 19.　We find our holding in *Funk* dispositive.　Under *Funk* and § 40-4-202, MCA, property acquired during a marriage is not divided and awarded upon the marriage's dissolution based on who holds legal title to the property.　The marital property is to be equitably distributed, regardless of ownership form.　Thus, whether the couple's tax return reflects an established form of ownership is inapposite.　Greg's objections to the contrary do not conform with § 40-4-202, MCA, and *Funk*.

11

¶18 We affirm the District Court's Findings of Fact, Conclusions of Law, and Decree of Dissolution.

¶19 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of relevant standards of review.

/S/ LAURIE McKINNON

We concur:

/S/ MICHAEL E WHEAT
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER